**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Eric J. Scheidler | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | |
| Metropolitan Pier and Exposition Authority, | ) | Judge: Robert M. Dow, Jr. |
| an Illinois municipal corporation; | ) | |
| Navy Pier, Inc., an Illinois corporation; | ) | Case No. 2016 cv 4288 |
| John Graeber, and Edward Montgomery | ) | |
| in their individual capacities | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| Defendants | ) | |

**DEFENDANT NAVY PIER INC. AND JOHN GRAEBER**
**ANSWERS TO PLAINTIFF'S COMPLAINT**

NOW COME the Defendants, NAVY PIER, INC., an Illinois corporation; and JOHN

GRAEBER, by and through their attorneys, SANCHEZ DANIELS & HOFFMAN LLP, and for

their Answer to Plaintiff's Complaint, state as following:

NATURE OF THE CASE

1.     This is a civil rights action under 42 U.S.C. § 1983 for arrest without probable

cause, for deprivation of liberty based on a Navy Pier Trespass Notice prohibiting Mr. Scheidler's

entry upon public property, and for the confiscation of personal property without due process. The

relief sought includes damages, declaratory and injunctive relief, costs, and reasonable attorney's

fees under 42 U.S.C. § 1988. In addition, this case includes state law claims of false arrest, false

imprisonment, and conversion of personal property.

**ANSWER: ADMITTED THAT THIS ACTION HAS BEEN FILED AS A CIVIL RIGHTS**

**ACTION PURSUANT TO FEDERAL AND STATE LAWS AND THE RELIEF SOUGHT**

**IS AS STATED. DENIED AS TO LEGAL CONCLUSIONS AND FACTUAL**

**ALLEGATIONS THAT SUCH VIOLATIONS WERE COMMITED BY THE DEFENDANTS.**

JURISDICTION AND VENUE

2.      Jurisdiction exists under 42 U.S.C. § 1983 (civil rights), 28 U.S.C. § 1331(federal question), § 1343 (civil rights), § 2201 (declaratory relief), § 2202 (further relief), and § 1367 (supplemental jurisdiction).

**ANSWER: ADMITTED.**

3.      Venue is proper in this district under 28 U.S.C. 1391(b) because all events giving rise to the claims asserted herein occurred in Cook County, Illinois.

**ANSWER:    ADMITTED.**

PARTIES

4.      Mr. Scheidler is and was at all relevant times an individual residing in Kane County, Illinois.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 4.**

5.      Defendant Navy Pier, Inc. ("NPI") is a not-for-profit corporation organized and existing under the laws of the State of Illinois.

**ANSWER: ADMITTED.**

6.      Defendant John Graeber ("Graeber") is an individual who at all relevant times was privately employed as the Security Director for NPI.

**ANSWER: ADMITTED.**

7.      On information and belief, prior to working for NPI, Graeber was employed in the City of Chicago's police department.

**ANSWER:** **ADMITTED.**

8.      Defendant Metropolitan Pier and Exposition Authority ("MPEA") is a municipal corporation, organized and existing for the benefit of the general public under 70 Ill. Comp. Stat. 210 *et. seq*. and under Article VII, Section 1, of the Illinois Constitution of 1970.

**ANSWER: THE ALLEGATIONS CONTAINED IN PARAGRAPH 9 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

9.      Defendant Edward Montgomery ("Montgomery") is an individual who at all relevant times was employed by the City of Chicago (the "City") in its police department.

**ANSWER: THE ALLEGATIONS CONTAINED IN PARAGRAPH 9 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

**ALLEGATIONS**

10.     Plaintiff incorporates by reference the allegations set forth above and further alleges and states:

**ANSWER: DEFENDANTS INCORPORATE BY REFERENCE THE ANSWERS TO THE ALLEGATIONS SET FORTH ABOVE.**

11.     MPEA holds title to and is authorized to operate and develop the area of the City known as Navy Pier, as recited in Recital A of an agreement between MPEA and NPI dated April 26, 2011. Exh. 1, attached hereto and incorporated herein (the "Management/Lease Agreement").

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 11 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.  TO THE**

EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE
ANSWERING DEFENDANTS, DEFENDANTS ADMIT THE EXISTENCE OF THE
AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF
WHICH SPEAKS FOR ITSELF AND OBJECTS TO THE LEGAL CONCLUSIONS
RELATED TO THE INTERPRETATION OF THE AGREEMENT.

12.     MPEA also manages for the City the area known as Gateway Park, adjoining
Navy Pier. Exh. 1, Recital B.

**ANSWER:** **TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN
PARAGRAPH 11 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS,
DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.  TO THE
EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE
ANSWERING DEFENDANTS, DEFENDANTS ADMIT THE EXISTENCE OF THE
AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF
WHICH SPEAKS FOR ITSELF AND OBJECTS TO THE LEGAL CONCLUSIONS
RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

13.     MPEA operates Navy Pier and Gateway Park together as tourist attractions. Exh.
1, Recital ¶ C.

**ANSWER:** **TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN
PARAGRAPH 11 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS,
DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.  TO THE
EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE
ANSWERING DEFENDANTS, DEFENDANTS ADMIT THE EXISTENCE OF THE
AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF**

WHICH SPEAKS FOR ITSELF AND OBJECTS TO THE LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.

14.     According to the Management/Lease Agreement, NPI was formed in part to operate Navy Pier "*for the benefit of the general public*" (emphasis added). Exh. 1, Recital ¶ E.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

15.     NPI was also formed in part for the purpose of "supporting and benefitting [MPEA] through the development and operations of Navy Pier for the *achievement of [MPEA's] own governmental purposes.*" (emphasis added). Exh. 1, Recital ¶ G.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

16.     MPEA and NPI agreed that it would be *"in the best interests of the public"* to enter into the lease by which NPI took possession of Navy Pier in addition to management of it. Exh. 1, Recital ¶ F.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

17.     MPEA and NPI agreed to re-develop Navy Pier with the intent to maintain its public nature. Exh. 1, ¶ 2.6.

**ANSWER:     DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

18.     MPEA delegated to NPI "*exclusive authority to operate and manage* Navy Pier and Gateway Park, and required that NPI "offer to the general public *free admission to the public* portions of [Navy Pier and Gateway Park]" (emphasis added). Exh. 1, ¶ 6.1.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

19.     MPEA also delegated to NPI responsibility to "hire and employ such personnel as shall in its judgment be required to operate, manage and maintain" Navy Pier and Gateway Park. Exh. 1, ¶ 6.1.1.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

20.     MPEA's delegation of authority to NPI included authorization to hire security personnel for Navy Pier and Gateway Park. Exh. 1, ¶ 6.1.1 and ¶ 6.7.2.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

21.     NPI agreed to and did assume all of MPEA's duties under a Gateway Park lease between MPEA and the City. Exh. 1, ¶ 8.1.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

22.     NPI accepted MPEA's "transfer of responsibility for the management operation and maintenance" of Navy Pier and Gateway Park. Exh. 1, Recital ¶ F20.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

23.     According to 70 Ill. Comp. Stat. 210/5.4 (3) and (6), MPEA generates billions of dollars for the benefit of the public through the collection of taxes upon activities at Navy Pier.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE STATUTE CITED WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE STATUTE.**

24.    MPEA's facilities at Navy Pier were constructed and renovated through the issuance of public bonds, according to 70 Ill. Comp. Stat. 210/5.4 (6), which bond debt is repaid in part by occupation and use taxes.

**ANSWER: THE ALLEGATIONS CONTAINED IN PARAGRAPH 24 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

25.    Under Public Law 096-098, all powers and duties vested in the MPEA Board of Directors and Chief Executive Officer were delegated to the Office of Trustee of MPEA, according to Resolution No. MPEA 11-09, dated July 19, 2011.

**ANSWER: THE ALLEGATIONS CONTAINED IN PARAGRAPH 25 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

26.    MPEA promised to deposit funds from MPEA, a public entity, into an Approved Operations Account for use by NPI, a private entity, for operations of Navy Pier. Exh. 1, ¶ 5.6.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

27.    MPEA and NPI agreed that admission to public portions of Navy Pier premises would continue to be offered to the "*general public*" (emphasis added). Exh. 1, ¶ 6.1.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR**

ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.

28.     NPI is required to pay merely $1.00 (one dollar) per year for its "lease" of Navy Pier, and MPEA agreed to provide to NPI the right to use MPEA's personnel in finance, legal, purchasing, human resources, technology, risk management and administrative functions. Exh. 1, ¶ 3.1, ¶ 6.5.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

29.     MPEA kept ownership of all Navy Pier intellectual property but granted a license to NPI for its use under the terms of the Management/Lease Agreement. Exh. 1, ¶ 6.1.1.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

30.     MPEA required NPI's board of directors to include MPEA's board chair, its secretary/treasurer and its CEO, and to make NPI's board meetings *open to the public.* Exh. 1, ¶ 14.3.3.

**ANSWER:** **DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

31.     Incorporated into an exhibit to the Management Lease/Agreement are three pages of detailed insurance requirements imposed by MPEA upon NPI in terms of specific coverages and specific amounts regarding NPI's management of Navy Pier. Exh. 1.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

32.     MPEA agreed to provide NPI with a non-interest bearing working capital loan of five million dollars. Exh. 1, ¶ 6.10

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

33.     Under a Second Amendment to the Management Lease/Agreement dated July 19, 2011 ("Second Amendment"), MPEA and NPI agreed that the Navy Pier premises *are and will continue to be publicly owned* and were partially constructed or improved with proceeds of tax exempt bonds issued by MPEA, a public entity. Exh. 2, attached hereto and incorporated by reference.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

34.    Also under the Second Amendment, MPEA required NPI to comply with all applicable MPEA bond indentures and to agree not to do anything to cause the Tax Exempt Bonds to be included in the gross income of bondholders.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

35.    Under the Third Amendment to the Management/Lease Agreement dated April 16, 2014 ("Third Amendment"), MPEA agreed to deposit the amount of $55 million for construction purposes, while MPEA and NPI also agreed that NPI was obligated to protect the tax exempt status of the MPEA bond funds and MPEA's *ability to issue tax exempt bonds for public purposes*. Exh. 3, attached hereto and incorporated by reference.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

36.    Under the Third Amendment, MPEA and NPI agreed that the Navy Pier premises "*are and will continue to be publicly owned* and were partially constructed or improved with proceeds of tax exempt bonds" issued by MPEA (emphasis added).

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

37.     As part of the Third Amendment, MPEA required NPI to submit for MPEA's approval its construction activities, provide quarterly reports of expenditures, and provide other information on MPEA's request.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

38.     NPI's purpose is to support and sustain the operation of Navy Pier for the "*use and enjoyment of the public*, including the Citizens of Chicago and visitors thereto," according to an agreement between MPEA and NPI dated January 27, 2011 (emphasis added) (the "Funding Agreement"). Exh. 4, attached hereto and incorporated herein.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

39.     In the Funding Agreement, MPEA and NPI agreed to establish a joint funding account into which MPEA agreed to deposit $220,000 toward salary and benefits to hire an initial NPI employee necessary to negotiate on behalf of NPI a management agreement between MPEA and NPI for the management and development of Navy Pier. Exh. 4.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

40.     Under a Resolution No. MPEA 14-06 dated April 23, 2014, MPEA and NPI agreed that MPEA had in fact deposited $60 million into a Capital Improvement Account for use by NPI in developing Navy Pier, and further agreed that the City had agreed to reimburse $55 million to MPEA which MPEA would deposit upon receipt to the Capital Improvement Account.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 40 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS ADMIT THE EXISTENCE OF A MPEA RESOLUTION AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO THE LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE SAME.**

41.     Under an Amendment dated May 16, 2014, to a 2011 promissory note in the amount of $5 million payable to MPEA by NPI *without interest*, MPEA agreed to extend the due date of the 2011 promissory note into two new separate due dates, *without interest.*

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT/AMENDMENT AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE SAME.**

42.     According to the understandings and dealings between MPEA and NPI set forth above, NPI is the agent of MPEA to manage Navy Pier and Gateway Park and in the alternative, NPI and MPEA are one and the same entity.

**ANSWER: DENIED.**

43.     On or about April 15, 2015, at or near the time of 5:10 p.m., Mr. Scheidler was walking north along a public sidewalk on the westernmost segment of North Streeter Drive, between East Grand Avenue and East Illinois Street in Chicago.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 43 AND DEMAND PROOF THEREOF.**

44.     Upon turning east onto Grand Avenue, a male NPI security guard told Mr. Scheidler to stop.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 44 AND DEMAND PROOF THEREOF.**

45.     The NPI security guard told Mr. Scheidler he would not be allowed to go any further.

**ANSWER:     DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 45 AND DEMAND PROOF THEREOF.**

46.     Mr. Scheidler was on a public sidewalk at the time the NPI security guard stopped him.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 46 AND DEMAND PROOF THEREOF.**

47.     The NPI security guard told Mr. Scheidler that the reason he was being forbidden from going further was because protesters were not allowed on Navy Pier.

**ANSWER:** **DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 47 AND DEMAND PROOF THEREOF.**

48. NPI and the security guard knew that Mr. Scheidler had been part of a First Amendment event.

**ANSWER:** **DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 48 AS THE ALLEGATIONS DO NOT IDENTIFY THE INDIVIDUAL AND CALLS FOR SPECULATION ABOUT THE UNIDENTIFIED INDIVIDUAL'S BELIEFS OR KNOWLEDGE.**

49. NPI and the security guard also knew that the First Amendment event was not conducted on NPI's premises at Navy Pier or Gateway Park.

**ANSWER:** **DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 48 AS THE ALLEGATIONS DO NOT IDENTIFY THE INDIVIDUAL AND CALLS FOR SPECULATION ABOUT THE UNIDENTIFIED INDIVIDUAL'S BELIEFS OR KNOWLEDGE.**

50. Mr. Scheidler was not engaged in any sort of a protest at either the time or location where the NPI security guard told him to stop.

**ANSWER:** **DENIED.**

51. Mr. Scheidler was not carrying a protest sign at either the time or location where the NPI security guard told him to stop.

**ANSWER:** **ADMITTED THAT PLAINTIFF WAS NOT CARRYING A PROTEST SIGN, BUT DENIED AS TO THE INSINUATION THAT PLAINTIFF WAS NOT A PART OF THE PROTEST.**

52.     Mr. Scheidler was wearing a GoPro camera which was clipped to his belt and was shooting video at the time the NPI security guard told him to stop.

**ANSWER:** **DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 52.**

53.     The NPI security guard radioed a female superior while detaining Mr. Scheidler on the public sidewalk.

**ANSWER:** **ADMITTED THAT NPI SECURITY GUARD RADIOED A SUPERVISOR. DENIED AS TO THE REMAINING ALLEGATIONS.**

54.     The female superior was Sophia Hardy, the second shift security supervisor for NPI.

**ANSWER:** **ADMITTED.**

55.     Sophia Hardy had authority to authorize Mr. Scheidler to enter Navy Pier on behalf of NPI.

**ANSWER:** **ADMITTED THAT HARDY HAD AUTHORITY TO AUTHORIZE PLAINTIFF TO ENTER NAVY PIER FOR THE SOLE PURPOSE OF USING THE RESTROOMS IN THE FAMILY PAVILION; DENIED THAT HARDY AUTHORIZED PLAINTIFF TO ENTER THE PIER FOR ANY OTHER PURPOSE OR ENTER ANY OTHER AREA OF THE PIER ON THE DATE OF THE INCIDENT.**

56.     Mr. Scheidler heard the NPI security guard ask Hardy if protesters could go onto Navy Pier.

**ANSWER:** DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 56 AS TO WHAT THE PLAINTIFF "HEARD".

57. Mr. Scheidler heard Hardy answer "yes."

**ANSWER:** DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 57 AS TO WHAT THE PLAINTIFF "HEARD." DENIED THAT MS. HARDY APPROVED THE PLAINTIFF GOING ONTO THE PIER.

58. The NPI security guard then permitted Mr. Scheidler to proceed along his way.

**ANSWER:** ADMITTED ONLY THAT A SECURITY GUARD ALLOWED THE PLAINTIFF TO ACCESS THE PIER, AT ONE SPECIFIC POINT IN TIME, FOR THE SOLE PURPOSE OF USING THE RESTROOMS IN THE FAMILY PAVILION. DENIED THAT PLAINIFF WAS PERMITTED TO "PROCEED ALONG HIS WAY."

59. Neither the NPI security guard nor Sophia Hardy imposed any restrictions on Mr. Scheidler's freedom of movement within Navy Pier prior to his entry thereto.

**ANSWER:** DENIED.

60. Mr. Scheidler then continued east on Grand Avenue and, upon reaching the easternmost segment of Streeter Drive, he turned south to walk toward the main front entrance to Navy Pier.

**ANSWER:** DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 60.

61. Mr. Scheidler entered through the front doors of the pier and proceeded to walk east.

**ANSWER: ADMITTED THAT PLAINTIFF WAS ALLOWED TO ENTER THE FRONT DOORS OF THE PIER FOR THE SOLE PURPOSE OF USING THE RESTROOM FACILITIES. DENIED THAT THE PLAINTIFF WAS PERMITTED TO WALK ANY FURTHER THAN THE RESTROOMS.**

62.     Inside the Navy Pier building, Mr. Scheidler walked along an interior concourse toward the end of the pier.

**ANSWER:  ADMITTED THAT PLAINTIFF PROCEEDED TO WALK THROUGH THE CONCOURSE BEYOND THE RESTROOMS.**

63.     The interior concourse is open to the public.

**ANSWER:  ADMITTED TO THE EXTENT THAT THE INTERIOR CONCOURSE IS GENERALLY OPEN TO THE PUBLIC WITH RESTRICTIONS IMPOSED AS NECESSARY BY NPI.  DENIED THAT THE ENTIRE CONCOURSE WAS OPEN TO THE PUBLIC ON THE DAY OF THE INCIDENT. DENIED THAT THE ENTIRE PORTION OF THE PLAINTIFF'S ROUTE ALONG THE CONCOURSE WAS OPEN TO THE PUBLIC AT THE TIME OF THE OCCURRENCE.**

64.     At or about 5:30 p.m., Mr. Scheidler came to a lobby area outside of the Grand Ballroom ("Lobby 3") where a woman asked him if he was there to attend an event. Mr. Scheidler answered the woman by saying, "No."

**ANSWER: DEEFENDANTS ADMIT THAT PLAINTIFF ENTERED THE LOBBY AREA NEAR THE BALLROOM AND ENCOUNTERED A WOMAN.  DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE REMAINING ALLEGATIONS OF PARAGRAPH 64.**

65.     Unable to proceed any further east due to reaching the end of the public concourse, Mr. Scheidler walked north toward a nearby exit which led outside to a sidewalk on the north side of Navy Pier.

**ANSWER: ADMITTED THAT THE PLAINTIFF EXITED THE PIER CONCOURSE ON THE NORTH SIDE OF NAVY PIER.  DENIED THAT THE CONCOURSE WAS OPEN TO THE PUBLIC AT THE TIME.**

66.     As Mr. Scheidler walked toward the exit door, the woman followed him.

**ANSWER: ADMITTED.**

67.     On his way out of the exit doors, Mr. Scheidler encountered two more NPI security guards. One of the guards said to him, "this way, sir," while pointing Mr. Scheidler toward the public sidewalk on the north side of Grand Avenue.

**ANSWER: ADMITTED THAT THE PLAINTIFF ENCOUNTERED AT LEAST ONE SECURITY GUARD UPON HIS EXIT FROM THE BUILDING.  DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE REMAINING ALLEGATIONS OF PARAGRAPH 67.**

68.     The sidewalk where Mr. Scheidler walked on the north side of Grand Avenue was at that time, and is generally, open for use by the public.

**ANSWER: ADMITTED THAT SAID SIDEWALK WAS OPEN FOR USE BY THE PUBLIC.**

69.     As Mr. Scheidler proceeded to the public sidewalk, he noticed that the woman who had followed him began talking to the security guards.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 69.**

70.     On information and belief, the woman disapproved of Mr. Scheidler's passing through Lobby 3.

**ANSWER:  DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 70.**

71.     Mr. Scheidler then proceeded west upon the Grand Avenue public sidewalk, noticing as he walked that a security van, which he believes to have been an NPI vehicle, passed him traveling east.

**ANSWER: ADMITTED THAT PLAINTIFF WALKED WEST ALONG GRAND AVENUE ON THE SIDEWALK AND ADMITS THE PRESENCE OF A NPI SECURITY VEHICLE. DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS REGARDING PLAINTIFF'S BELIEFS OR WHAT HE "NOTICED".**

72.     Shortly after noticing the security van, Mr. Scheidler saw that it had turned around and was slowly following him in the street as he walked on the public sidewalk.

**ANSWER:  ADMITTED THAT A NPI SECURITY VEHICLE FOLLOWED PLAINTIFF ALONG GRAND AVENUE.  DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE REMAINING ALLEGATIONS REGARDING WHAT PLAINTIFF NOTICED OR SAW.**

73.     As Mr. Scheidler approached the corner of Grand Avenue and the easternmost segment of Streeter Drive, another NPI security guard approached him and demanded to see Scheidler's identity paper ("I.D.").

**ANSWER: ADMITTED THAT A NPI GUARD APPROACHED PLAINTIFF. AT THIS TIME DEFENDANT LACKS SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE REMAINING ALLEGATIONS REGARDING WHAT WAS SAID BY THE UNIDENTIFIED NPI SECURITY GUARD.**

74.     The NPI security guard had no legal grounds to demand Mr. Scheidler's I.D., nor did Mr. Scheidler have a legal duty to provide it to him.

**ANSWER: DEFENDANTS OBJECT TO THE LEGAL CONCLUSIONS/STATEMENTS CONTAINED IN PARAGRAPH 74. NOTHWITHSTANDING SAID OBJECTION, DEFENDANTS DENY THE ALLEGATIONS.**

75.     Mr. Scheidler walked past the guard and continued to walk west along Grand Avenue on the sidewalk, noticing that the NPI security guard was following him.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS REGARDING WHAT THE PLAINTIFF NOTICED. DEFENDANTS ADMIT THE REMAINING ALLEGATIONS OF FACT IN PARAGRAPH 75.**

76.     Upon reaching the intersection of Grand Avenue and Streeter Drive and while proceeding into the crosswalk across Streeter Drive, Mr. Scheidler encountered Defendant Montgomery, who verbally engaged Mr. Scheidler and followed Mr. Scheidler into the crosswalk while demanding to see Mr. Scheidler's I.D.

**ANSWER:** TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 76 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS ADMIT THAT THERE WAS AN ENCOUNTER BUT DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS REGARDING WHAT EXACTLY WAS SAID BY DEFENDANT MONTGOMERY.

77. Montgomery and Mr. Scheidler arrived at the northwest corner of Grand Avenue and Streeter Drive, where Mr. Scheidler offered to identify himself to Montgomery but did not immediately produce his I.D.

**ANSWER:** TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 77 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS ADMIT THAT THERE WAS AN ENCOUNTER AND VERBAL EXCHANGE BUT DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS REGARDING WHAT EXACTLY WAS SAID.

78. Montgomery then ordered Mr. Scheidler to step into a separate area, off of the public sidewalk under a canopy, out of view of the surveillance cameras on and around Navy Pier.

**ANSWER:** TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 78 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS,

DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS ADMIT THERE WAS AN ENCOUNTER WITH THE PLAINTIFF AND DEFENDANT MONTGOMERY BUT DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS AS TO WHAT WAS SAID.

79. Mr. Scheidler believes and is informed that Montgomery knew the locations of the said surveillance cameras and knew they would be unable to record his interactions with Montgomery under the canopy.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 79.**

80. Montgomery then ordered Mr. Scheidler to produce his I.D., and in response, Mr. Scheidler again offered to identify himself but did not immediately produce his I.D.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 80 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS ADMIT THERE WAS AN ENCOUNTER WITH THE PLAINTIFF AND DEFENDANT MONTGOMERY BUT DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS AS TO WHAT WAS SAID.**

81. Montgomery threatened to arrest and jail Mr. Scheidler for trespassing if he refused to surrender his I.D.

**ANSWER:** **TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 81 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS ADMIT THERE WAS AN ENCOUNTER WITH THE PLAINTIFF AND DEFENDANT MONTGOMERY BUT DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS AS TO WHAT WAS SAID.**

82.     Montgomery had no legal grounds to demand Mr. Scheidler's I.D.

**ANSWER:** **TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 82 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS.**

83.     Montgomery had no reasonable suspicion to believe that Mr. Scheidler had a legal duty to produce his I.D. to Montgomery.

**ANSWER:** **TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 83 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS.**

84.     Mr. Scheidler had no legal duty to produce his I.D. to Montgomery.

**ANSWER:** TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 84 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS.

85.     When Mr. Scheidler tried to get his I.D. out of his wallet, Montgomery accused him of resisting arrest.

**ANSWER:** TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 85 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 85.

86.     Montgomery had not announced to Mr. Scheidler that he was under arrest before Plaintiff tried to produce his I.D.

**ANSWER:** TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 86 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS ADMIT THERE WAS AN ENCOUNTER WITH THE PLAINTIFF AND DEFENDANT MONTGOMERY BUT DEFENDANTS

**LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS AS TO WHAT WAS SAID.**

87.     Montgomery had no reasonable basis to believe that Mr. Scheidler was resisting arrest.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 87 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS AS THEY RELATE TO DEFENDANT MONTGOMERY'S BELIEFS AND OBJECT TO THE LEGAL CONCLUSIONS REGARDING THE SAME.**

88.     At the time and location of his arrest, Mr. Scheidler was on public property.

**ANSWER: ADMITTED.**

89.     Montgomery had no reasonable suspicion to believe that Mr. Scheidler was or had been trespassing at the time of or prior to his arrest.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 89 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS OBJECT TO THE LEGAL CONCLUSIONS CONTAINED IN PARAGRAPH 89. NOTHWITHSTANDING SAID OBJECTION, DEFENDANTS DENIES THE ALLEGATIONS.**

90.     Mr. Scheidler informed Montgomery that he was calling his attorney as he attempted to use his cell phone, at which point Montgomery grabbed Scheidler's arm and wrenched it behind his back in order to handcuff Mr. Scheidler.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 90 OTHER THAN TO ADMIT THAT THE PLAINTIFF WAS HANDCUFFED AND ARRESTED.**

91.     The NPI security guard who had first asked for Mr. Scheidler's I.D. and a female City police officer both approached Mr. Scheidler and pulled his arms back.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 91 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS ADMIT THAT A NPI SECURITY GUARD ASSISTED IN THE ARREST OF THE PLAINTIFF.**

92.     The NPI security guard wrenched Plaintiff's cell phone out of his hand.

**ANSWER: DENIED.**

93.     Upon realizing he was being arrested, Mr. Scheidler yelled to his assistant, Matt Yonke, for aid.

**ANSWER: ADMITTED THAT THE PLAINTIFF ATTEMPTED TO COMMUNICATE WITH A THIRD PARTY. DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE REMAINING**

**ALLEGATIONS REGARDING THE PLAINTIFF'S STATE OF MIND AND IDENTITY OF THE THIRD PARTY.**

94. Mr. Yonke approached the scene and was himself threatened with arrest.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 94.**

95. Mr. Yonke took what video he could of the scene from a distance, and notified other members of the group who had been protesting about Mr. Scheidler's arrest.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 95.**

96. Once Mr. Scheidler was handcuffed, Montgomery forced him back onto Navy Pier, took him into a holding room and ordered him to sit on a bench.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 96.**

97. Montgomery took from Mr. Scheidler's belt his GoPro camera while the camera was still recording.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 97.**

98. Mr. Scheidler asked Montgomery for permission to shut off the camera to prevent already-recorded, exculpatory footage from being recorded over, but Montgomery replied that "If Navy Pier wants it erased, it will be erased."

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 98.**

99. Based on Montgomery's remark, Mr. Scheidler reminded Montgomery that he would be destroying evidence if he did not preserve the camera footage.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 99.**

100. Montgomery told Mr. Scheidler he was being booked for trespassing.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 100.**

101. Montgomery told Mr. Scheidler he could have avoided arrest if he had surrendered his I.D.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 101.**

102. Mr. Scheidler tried to sit back on the bench, but as a result, the metal handcuffs tightened horribly, causing numbness in the sides of his palms and his no. 5 phalanges.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 102.**

103. While Mr. Scheidler was handcuffed and detained on the bench inside Navy Pier, Graeber came to the doorway, causing Mr. Scheidler to recognize him from an encounter the previous year.

**ANSWER: ADMITTED THAT DEFENDANT GRABER CAME TO THE HOLDING AREA. DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO**

FORM A BELIEF ABOUT THE TRUTH OF THE REMAINING ALLEGATIONS OF PARAGRAPH 103.

104.  Shortly after Graeber left, NPI personnel gave Mr. Scheidler a written document entitled, "Navy Pier Trespass Notice," a copy of which is attached and incorporated herein as **Exh. 5** (the "Trespass Notice").

**ANSWER: ADMITTED.**

105.  The Trespass Notice falsely stated that Mr. Scheidler had been 'protesting' on Navy Pier.

**ANSWER: DENIED.**

106.  Graeber and the other NPI personnel, together with Montgomery, knew that Mr. Scheidler had not been "protesting" on Navy Pier.

**ANSWER: DENIED.**

107.  Graeber and the other NPI personnel, together with Montgomery knew that the Trespass Notice falsely stated that Mr. Scheidler had been "protesting" on Navy Pier.

**ANSWER: DENIED.**

108.  Graeber and the other NPI personnel, together with Montgomery, forced Mr. Scheidler to sign the false Trespass Notice while he was still their captive inside Navy Pier.

**ANSWER: DENIED.**

109.  Two more Chicago police officers arrived at the security room at Navy Pier to take Mr. Scheidler to 18th Division headquarters, replacing the metal handcuffs with different restraints.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 109.**

110. One of the City's transporting police officers searched Mr. Scheidler's pocket and removed a mechanical pencil.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 110.**

111. Montgomery shoved the mechanical pencil into Mr. Scheidler's jacket pocket right before he was being taken away, causing Mr. Scheidler to remember to ask about his cell phone and GoPro camera. Mr. Scheidler was told that other persons would be transporting his property to the police station.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 111.**

112. At or about 6:10 p.m., Mr. Scheidler was put into a Chicago city police transport vehicle and taken to the police station.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 112.**

113. Mr. Scheidler was placed in a holding cell near a processing area at which time the restraints were removed.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 113.**

114.     Mr. Scheidler's wrists were red, swollen and painful from the handcuffs and restraints.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 114.**

115.     After about an hour in the holding cell, Montgomery took Mr. Scheidler to be photographed, finger printed and hand printed with a scanning machine.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 115.**

116.     Thereafter Mr. Scheidler was removed to another cell with a concrete bench. After about 2 hours, he was taken out of the cell to the front of the police station.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 116.**

117.     By the time of his release, Mr. Scheidler had not eaten for over 13 hours.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 117.**

118.     Upon his release, Mr. Scheidler was given his belongings, including shoelaces, belt, wallet and his Go Pro video camera.

**ANSWER:** **DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 118.**

119.    The next morning, Mr. Scheidler examined the GoPro and discovered that the battery had been removed and placed inside the belt clip for the camera.

**ANSWER:** **DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 119.**

120.    When Mr. Scheidler plugged the GoPro camera into his computer, the computer failed to show the camera as being connected, which failure caused Mr. Scheidler to discover on closer examination that the GoPro's micro SD memory card had been removed.

**ANSWER:** **DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 120.**

121.    At the time that Montgomery had taken the GoPro camera from Mr. Scheidler's belt, the camera's micro SD memory card had been securely in its proper place inside the camera and covered with a protective door.

**ANSWER:** **DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 121.**

122.    During the time that NPI, Graeber, Montgomery or other City police were in possession of Mr. Scheidler's GoPro camera, they confiscated the camera's battery and micro SD

memory card without legal justification, confirming Montgomery's statement that, "If NPI wants it erased, it will be erased."

**ANSWER: DENIED.**

123.    The micro SD memory card contained the exculpatory video evidence of events leading up to and after Mr. Scheidler's arrest.

**ANSWER: DEFENDANTS LACK SUFFICIENT KNOWLEDGE OR INFORMATION TO FORM A BELIEF ABOUT THE TRUTH OF THE ALLEGATIONS OF PARAGRAPH 123.**

124.    On information and belief, the micro SD memory card was confiscated by deliberate acts by NPI, Graeber and/or Montgomery and/or others under their direction.

**ANSWER: DENIED.**

125.    On information and belief, said defendants confiscated Mr. Scheidler's micro SD memory card in order to cover up their illegal actions which had been recorded on the GoPro camera's micro SD memory card.

**ANSWER: DENIED.**

126.    The areas known as Navy Pier and Gateway Park are publicly owned properties.

**ANSWER: ADMITTED.**

127.    At all times that Mr. Scheidler was in or on Navy Pier on April 15, 2015, he was on publicly owned property.

**ANSWER: ADMITTED PLAINTIFF WAS ON PUBLIC PROPERTY BUT DENIED THAT HE HAD AUTHORITY TO BE IN CERTAIN AREAS.**

128.    At no time prior to his arrest was Mr. Scheidler in violation of any order to leave Navy Pier or any order prohibiting him from entering upon Navy Pier.

**ANSWER: DENIED.**

129.     Navy Pier was open to the public at the time Mr. Scheidler entered upon the premises.

**ANSWER: DENIED.**

130.     At no time prior to his arrest on April 15, 2015 was Mr. Scheidler in any area that was not open to the public.

**ANSWER: DENIED.**

131.     A system of surveillance cameras exists and operates on Navy Pier.

**ANSWER: ADMITTED.**

132.     On April 15, 2015, the Navy Pier surveillance cameras were operating for all or part of the day.

**ANSWER: ADMITTED.**

133.     From the time he entered onto and into Navy Pier, Mr. Scheidler's presence was videoed and recorded by the Navy Pier surveillance cameras.

**ANSWER: DENIED.**

134.     On information and belief, NPI's security personnel watched or had the opportunity to watch Mr. Scheidler on security monitors in real time or after-the-fact on recorded footage.

**ANSWER: ADMITTED THAT SOME OF PLAINTIFF'S ACTIVITIES WERE SEEN IN REAL-TIME AND SOME OF PLAINTIFF'S ACTIVITIES WERE SEEN AFTER-THE-FACT ON RECORDED FOOTAGE. DENIED THAT ALL OF PLAINTIFF'S ACTIVITIES WERE SEEN IN REAL-TIME OR CAUGHT ON SECURITY MONITORS.**

135.     Two days after Mr. Scheidler's arrest, his legal counsel sent a "litigation hold" letter to NPI and Graeber demanding preservation of the surveillance footage.

**ANSWER: ADMITTED.**

136. On information and belief, NPI, Graeber and/or other NPI personnel destroyed, or in the alternative, purposely failed to maintain the NPI surveillance video that would show that Mr. Scheidler had not been trespassing prior to his arrest.

**ANSWER: DENIED.**

137. On information and belief, NPI's security personnel intentionally destroyed numerous exculpatory video recordings in order to cover up Mr. Scheidler's innocence and wrongful arrest.

**ANSWER: DENIED.**

138. Mr. Scheidler was charged with violating 720 Ill. Comp. Stat. 5/21-3(a) 1 ("knowingly and without lawful authority enters or remains within or on a building) (the "Trespass Statute").

**ANSWER: ADMITTED THAT PLAINTIFF WAS CHARGED CRIMINALLY.**

139. The Trespass Statute specifically does *not* apply: "to being in a building which is open to the public during its normal hours of operation" nor "to a person who enters a public building under the reasonable belief that the building is still open to the public." 5/21-3(b).

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE TRESPASS STATUTE WHICH SPEAKS FOR ITSELF AND OBJECTS TO THE ALLEGATIONS OF PARAGRAPH 139 TO THE EXTENT IT CONTAINS LEGAL CONCLUSIONS OR STATEMENTS.**

140. On information and belief, at the time of Mr. Scheidler's arrest, Montgomery and Graber had both served many years as Chicago police officers and knew each other or knew of each other.

**ANSWER: ADMITTED THAT DEFENDANT GRABER SERVED AS A CHICAGO POLICE OFFICER PRIOR TO HIS EMPLOYMENT WITH NPI. DENIED AS TO THE REMAINING ALLEGATIONS.**

141.     On information and belief, Montgomery and Graeber conspired to effect Mr. Scheidler's illegal arrest, to issue the "Trespass Notice" and pursue Mr. Scheidler's prosecution.

**ANSWER: DENIED.**

142.     On information and belief, Montgomery and Graeber conspired in their unconstitutional acts because of Mr. Scheidler's pro-life views and the exercise of his First Amendment rights at a another location.

**ANSWER: DENIED.**

143.     Neither Montgomery nor Graeber had any reasonable suspicion to believe that Mr. Scheidler had violated the Trespass Statute.

**ANSWER: DENIED AS IT PERTAINS TO THE ANSWERING DEFENDANTS.**

144.     A reasonable police officer would know that the Trespass Statute did not apply to the areas of Navy Pier where Mr. Scheidler had walked on April 15, 2015.

**ANSWER: DENIED AS TO THE FACTUAL ALLEGATIONS. DEFENDANTS OBJECT TO THE LEGAL CONCLUSIONS STATED.**

145.     Montgomery, Graeber and NPI's security personnel had no probable cause to believe that Mr. Scheidler had violated the Trespass Statute because Hardy and NPI's security guard had expressly granted permission for him to enter the Navy Pier building, but which permission was not legally required.

**ANSWER: DENIED.**

146.     Montgomery, Graeber and NPI's security personnel had no probable cause to believe that Mr. Scheidler had violated the Trespass Statute because they knew that on April 15, 2015, Navy Pier was public property and was open to the public and to Mr. Scheidler.

**ANSWER: DENIED.**

147.     NPI, Graeber and NPI's Sophia Hardy cooperated with the City in the prosecution of Mr. Scheidler.

**ANSWER: ADMITTED THAT THE DEFENDANTS WERE REQUIRED TO TESTIFY IN THE CRIMINAL PROCEEDING.**

148.     Mr. Scheidler's trial took place on August 3, 2015.

**ANSWER: ADMITTED TO THE EXTENT THAT PUBLIC RECORDS REFLECT THE SAME.**

149.     At his trial, Mr. Scheidler was found not guilty.

**ANSWER: ADMITTED TO THE EXTENT THAT PUBLIC RECORDS REFLECT THE SAME.**

NPI

150.     Graeber testified at Mr. Scheidler's trial that the policy of NPI is: "If a person's presence on the Pier would disrupt any activity that's taking place in a private area, which the Grand Ballroom is a private area, that would not be an area that the public is allowed to enter." (the "Policy"). Transcript excerpt, Exh. 6, attached

**ANSWER: ADMITTED.**

151.     NPI's Policy is unconstitutionally vague on its face under the 14th Amendment by allowing unbridled discretion in NPI's personnel to determine the meaning of the word "disrupt" in subjective rather than objective terms.

**ANSWER: DENIED.**

152.    NPI's Policy is unconstitutionally vague under the 14th Amendment as applied to Mr. Scheidler because it is undisputed that he never entered into the Grand Ballroom and did not disrupt any activity taking place in a private area of Navy Pier.

**ANSWER: DENIED.**

153.    NPI's Policy is unconstitutional under the First Amendment as applied to Mr. Scheidler because NPI, disfavoring his off-site speech activities and his point of view, used the NPI Policy as grounds to penalize and deter Mr. Scheidler from the exercise of his First Amendment rights.

**ANSWER: DENIED.**

154.    NPI's Policy was the moving force behind NPI's deprivation of Mr. Scheidler's rights as described herein.

**ANSWER: DENIED.**

155.    In the alternative, NPI failed to adopt and implement a policy or policies on the unconstitutional use of arrest, confiscation and issuance of Trespass Notices against members of the public.

**ANSWER: DENIED.**

156.    NPI reasonably should have known that its security personnel would likely violate the public's and Mr. Scheidler's constitutional rights without a policy prohibiting NPI's unconstitutional use of arrest, confiscation and issuance of Trespass Notices.

**ANSWER: DENIED.**

157. NPI failed to adopt and implement any policy or policies restricting the unconstitutional use of arrest, confiscation and issuance of Trespass Notices when such policy was needed to prevent predictable violations by NPI personnel.

**ANSWER: DENIED.**

158. The need for a policy or policies restricting NPI's unconstitutional use of arrest, confiscation and issuance of Trespass Notices was so obvious that NPI's failure to adopt and implement any such a policy is properly characterized as deliberate indifference.

**ANSWER: DENIED.**

159. NPI's deliberate indifference was the moving force behind NPI's deprivation of Mr. Scheidler's rights, as described by the facts set forth herein.

**ANSWER: DENIED.**

MPEA AND NPI

160. In forming, hiring and funding NPI to act as its agent, MPEA failed to adopt a policy or policies that limit NPI's authority to take actions against members of the public through private security personnel.

**ANSWER: DENIED.**

161. MPEA maintains a policy and a practice of totally delegating security operations at Navy Pier to NPI under the terms of the Management/Lease Agreement, Exhibit 1, attached.

**ANSWER: DEFENDANTS ADMIT THE EXISTENCE OF THE AGREEMENT MADE PART OF THE PLEADING AND THE CONTENT THEREOF WHICH SPEAKS FOR ITSELF AND OBJECTS TO LEGAL CONCLUSIONS RELATED TO THE INTERPRETATION OF THE AGREEMENT.**

162.     MPEA's total delegation of security to a private company, NPI, exhibits deliberate indifference to the constitutional rights of the public to be free from random stops, from arrest without probable cause, from intentional confiscation of private property, and from the threat of arrest and deprivation of liberty and due process manifested by the Trespass Notice.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 162 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS.**

163.     As the owner of public property, MPEA reasonably should have known that NPI's private security personnel would likely violate the public's and Mr. Scheidler's rights under the constitution of the United States.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 162 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS.**

164.     MPEA failed to adopt and implement any policy or policies limiting the actions of security personnel when such policy was needed to prevent predictable violations by NPI of the United States Constitution and Mr. Scheidler's rights thereunder.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 162 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE**

EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS.

165. The need for a policy or policies restricting NPI's actions conducted through the use of private security personnel was so obvious that MPEA's failure to adopt and implement any such a policies is properly characterized as deliberate indifference.

**ANSWER:** **TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 162 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS.**

166. MPEA's deliberate indifference was the moving force behind NPI's deprivation of Mr. Scheidler's rights, as described by the facts set forth herein.

**ANSWER:** **TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 162 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS.**

167. MPEA has a pattern of deliberate indifference to the public's exercise of their constitutional rights on Navy Pier and Gateway Park, as evidenced by one or more lawsuits filed in this federal district.

**ANSWER:** **TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 162 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE**

**EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS.**

168.    In the alternative, MPEA's delegation of discretion to NPI to hire personnel amounts to MPEA's acquiescence or ratification of NPI's unconstitutional decisions, policies and practices, including the acts against Mr. Scheidler, described herein.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 162 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS AND OBJECT TO THE LEGAL CONCLUSIONS.**

169.    In the alternative, MPEA is liable for the unconstitutional acts of its private agent, NPI, under the doctrine of *respondeat superior*.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS CONTAINED IN PARAGRAPH 162 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS. TO THE EXTENT THAT SUCH ALLEGATIONS ARE CONSTRUED AGAINST THE ANSWERING DEFENDANTS, DEFENDANTS DENY THE ALLEGATIONS AND OBJECT TO THE LEGAL CONCLUSIONS.**

170.    At all times relevant hereto, NPI was a state actor for purposes of liability under 42 U.S.C. § 1983 according to the facts set forth herein.

**ANSWER: DENIED.**

171.    As a state actor, NPI's personnel are not entitled to qualified immunity in this case.

**ANSWER: DENIED.**

172.    The actions of NPI's personnel set forth herein, including but not limited to Graeber's, were done in the ordinary course and scope of their employment by NPI.

**ANSWER: ADMITTED THAT THE NPI EMPLOYEES WERE ACTING WITHIN THE SCOPE OF THEIR EMPLOYMENT.  DENIED THAT SAID EMPLOYEES VIOLATED ANY RIGHTS OR LAWS IN THE PERFORMANCE OF SAID EMPLOYMENT AS ALLEGED.**

THE TRESPASS NOTICE – LACK OF PROCEDURAL DUE PROCESS

173.    On information and belief, NPI maintains a policy, custom, and practice of issuing a "Trespass Notice" similar to Exh. 5, attached hereto, to members of the public in order to deprive them of their liberty to enter upon the public premises of Navy Pier.

**ANSWER: DENIED.**

174.    NPI is without legal authority to issue "Trespass Notices" that prohibit members of the public from entering upon the public premises of Navy Pier.

**ANSWER:  DENIED.**

175.    On information and belief, MPEA was aware of the NPI policy, custom, and practice of issuing "Trespass Notices" to the public.

**ANSWER:  THE ALLEGATIONS CONTAINED IN PARAGRAPH 175 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

176.    MPEA acquiesced in NPI's issuance of unconstitutional "Trespass Notices" notices.

**ANSWER:** THE ALLEGATIONS CONTAINED IN PARAGRAPH 176 ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.

177.     In the alternative, MPEA was deliberately indifferent to NPI's issuance of unconstitutional "Trespass Notices."

**ANSWER:** THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.

178.     Neither MPEA nor NPI provided a process to Mr. Scheidler for opposing or vacating the "Trespass Notice" issued to him.

**ANSWER:** DENIED

179.     The "Trespass Notice" operates as an injunction against Mr. Scheidler.

**ANSWER:** DEFENDANTS OBJECT TO THE ALLEGATIONS OF PARAGRAPH 179 TO THE EXTENT THAT IT CONTAINS LEGAL CONCLUSIONS/STATEMENTS. TO THE EXTENT THAT THE ALLEGATIONS ARE CONSTRUED TO CONSTITUTE FACTUAL ALLEGATIONS, THE SAME ARE DENIED.

180.     The "Trespass Notice" enjoined, and continues to enjoin, Mr. Scheidler from entry onto Navy Pier and Gateway Park under a threat of arrest and criminal prosecution.

**ANSWER:** DEFENDANTS OBJECT TO THE ALLEGATIONS OF PARAGRAPH 180 TO THE EXTENT THAT IT CONTAINS LEGAL CONCLUSIONS/STATEMENTS. TO THE EXTENT THAT THE ALLEGATIONS ARE CONSTRUED TO CONSTITUTE FACTUAL ALLEGATIONS, THE SAME ARE DENIED.

181.     NPI and Graeber issued the "Trespass Notice" to Mr. Scheidler without service of a summons and complaint as required by Rule 4 and 7 of the Federal Rules of Civil Procedure and by similar Illinois state rules of procedure.

**ANSWER: DENIED.**

182.     NPI and Graeber's issuance of the "Trespass Notice" deprived Mr. Scheidler of a short, plain statement of the grounds for its jurisdiction and basis of its claim, as required by Rule 8 of the Federal Rules of Civil Procedure and by similar Illinois state rules of procedure.

**ANSWER: DEFENDANTS OBJECT TO THE ALLEGATIONS OF PARAGRAPH 182 TO THE EXTENT THAT IT CONTAINS LEGAL CONCLUSIONS/STATEMENTS. TO THE EXTENT THAT THE ALLEGATIONS ARE CONSTRUED TO CONSTITUTE FACTUAL ALLEGATIONS, THE SAME ARE DENIED.**

183.     In issuing the "Trespass Notice" to Mr. Scheidler, NPI and Graeber circumvented the procedural due process protections to which Mr. Scheidler is entitled under the United States Constitution and by the Rules of Civil Procedure in either Illinois state court or this federal court.

**ANSWER: DENIED.**

DEFENDANTS ENGAGED IN VIEWPOINT DISCRIMINATION

184.     On the day of Mr. Scheidler's arrest, NPI had rented the Grand Ballroom to an abortion provider for an event on the same day.

**ANSWER: ADMITED THAT VARIOUS PORTIONS OF THE PIER WERE RENTED TO AN ORGANIZATION ON THE DAY OF PLAINTIFF'S ARREST. DENIED AS TO OTHER ALLEGATIONS.**

185.     On the day of Mr. Scheidler's arrest, NPI had displayed a photograph of Mr. Scheidler and other pro-life persons at the NPI security offices.

46

**ANSWER: DENIED.**

186. On information and belief, NPI displayed Mr. Scheidler's photograph and those of other pro-life persons to prepare its security personnel to take action against them should they enter upon Navy Pier and Gateway Park.

**ANSWER: DENIED.**

187. On information and belief, NPI and Graeber issued the "Trespass Notice" to Mr. Scheidler and took other actions against him based upon his political point of view opposing abortion.

**ANSWER: DENIED.**

188. MPEA maintains a policy, custom, or practice of disfavoring political viewpoints, as documented by prior litigation in this district by a different victim of MPEA's unconstitutional conduct.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

CONFISCATION OF VIDEO

189. On information and belief, NPI maintained a custom, policy, or practice of confiscating video recording equipment according to the statement by Montgomery to Mr. Scheidler that if NPI wanted his video erased, it would be erased; or in the alternative, NPI carried out a custom, policy, or practice by MPEA of doing so, as documented by prior litigation in this district by a different victim of such unconstitutional conduct.

**ANSWER: DENIED.**

190.     MPEA was aware of the NPI policy, custom and practice of confiscating video recording equipment, as documented by prior litigation in this district by a different victim of NPI's unconstitutional conduct.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

191.     MPEA acquiesced or approved of NPI's confiscation of Mr. Scheidler's micro SD memory card.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

192.     In the alternative, MPEA was deliberately indifferent to NPI's confiscation of the public's and Mr. Scheidler's recording equipment.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

THE TRESPASS NOTICE CAUSES IRREPARABLE HARM

193.     The Trespass Notice causes Mr. Scheidler irreparable harm by preventing him from being part of important events and occasions at Navy Pier, such as the Shakespeare Theater for plays that his drama-major daughter seeks to perform in or attend with Mr. Scheidler, cruise events involving benefit dinners and annual conferences for groups he either leads or belongs to, festivals such as the Archdiocese of Chicago's Festival of Faith, and attractions of special interest to his eight children such as the Chicago Children's Museum.

**ANSWER: DENIED.**

194. The Trespass Notice further causes Mr. Scheidler irreparable harm because each time he is in view of Navy Pier, for example from Lake Shore Drive near Buckingham Fountain and from the 95th Floor of John Hancock Center, he is reminded of the ongoing Trespass Notice simply by seeing Navy Pier in the Chicago skyline.

**ANSWER: DENIED.**

**CLAIMS FOR RELIEF**

195. Mr. Scheidler incorporates the above paragraphs and further alleges:

**ANSWER: DEFENDANTS RE-ALLEGE ITS ANSWERS TO THE PRECEDING PARAGRPAHS HEREIN.**

FIRST CLAIM FOR RELIEF –
AGAINST MONTGOMERY FOR 4th AMENDMENT DEPRIVATION

196. By placing Mr. Scheidler under arrest, Montgomery restricted or caused one or more officers to restrict Mr. Scheidler's freedom of movement.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

197. Montgomery arrested Mr. Scheidler or caused his said arrest without any reasonable suspicion or probable cause that a crime was being or had been committed.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

198. No police officer could have reasonably believed that Mr. Scheidler had committed a crime prior to Mr. Scheidler's arrest.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

199.    Montgomery is liable under 42 U.S.C. § 1983 for depriving Mr. Scheidler of his right under the 4th Amendment to the United States Constitution to be free from unlawful arrest, search and detention.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

SECOND CLAIM FOR RELIEF –
AGAINST GRAEBER FOR 4th AMENDMENT DEPRIVATION

200.    Graeber and other NPI personnel directly and indirectly assisted Montgomery in Mr. Scheidler's arrest.

**ANSWER: DEFENDANT GRAEBER DENIES THE ALLEGATIONS OF PARAGRAPH 200.   DEFENDANT NPI ADMITS THAT SECURITY PERSONNEL ASSISTED DEFENDANT MONTGOMERY.**

201.    Graeber and other NPI personnel used NPI premises for purposes of detaining Plaintiff in handcuffs after his arrest.

**ANSWER: DENIED.**

202.    The NPI personnel other than Graeber acted upon Graeber's orders and/or acquiesced and ratified the arrest and detention of Mr. Scheidler.

**ANSWER: DENIED.**

203.     Graeber is liable under 42. U.S.C. § 1983 for depriving Mr. Scheidler of his right under the 4th Amendment to the United States Constitution to be free from unlawful arrest, search and detention

. **ANSWER: DENIED.**

### THIRD CLAIM FOR RELIEF –
### AGAINST NPI FOR 4th AMENDMENT DEPRIVATION

204.     NPI is liable under 42. U.S.C. § 1983 for depriving Mr. Scheidler of his right under the 4th Amendment to United States Constitution to be free from unlawful arrest, search and detention.

**ANSWER: DENIED.**

### FOURTH CLAIM FOR RELIEF –
### AGAINST MPEA FOR 4th AMENDMENT DEPRIVATION

205.     MPEA is liable under 42. U.S.C. § 1983 for depriving Mr. Scheidler of his right under the 4th Amendment to United States Constitution to be free from unlawful arrest, search and detention.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

### FIFTH CLAIM FOR RELIEF –
### AGAINST GRAEBER FOR 14th AMENDMENT PROCEDURAL DUE PROCESS
### DEPRIVATION

206.     Graeber is liable under 42. U.S.C. § 1983 for depriving Mr. Scheidler of his right under the 14th Amendment to the United States Constitution to procedural due process.

**ANSWER: DENIED.**

### SIXTH CLAIM FOR RELIEF –

### AGAINST NPI FOR 14th AMENDMENT PROCEDURAL DUE PROCESS DEPRIVATION

207.    NPI is liable for depriving Mr. Scheidler of his right under the 14th Amendment to the United States Constitution to procedural due process.

**ANSWER: DENIED.**

SEVENTH CLAIM FOR RELIEF –
AGAINST MPEA FOR 14th AMENDMENT PROCEDURAL DUE PROCESS
DEPRIVATION

208.    MPEA is liable under 42. U.S.C. § 1983 for depriving Mr. Scheidler of his right under the 14th Amendment to the United States Constitution to procedural due process.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

EIGHTH CLAIM FOR RELIEF -
AGAINST GRAEBER FOR 14th AMENDMENT DEPRIVATION OF LIBERTY

209.    Mr. Scheidler has a liberty interest under the 14th Amendment to freely enter upon the public portions of Navy Pier and Gateway without threat of arrest.

**ANSWER: DENIED.**

210.    By reason of the Trespass Notice, Mr. Scheidler is deprived of his right to freely enter upon the public portions of Navy Pier and Gateway Park without fear of arrest and prosecution.

**ANSWER: DENIED.**

211.    Graeber is liable under 42. U.S.C. § 1983 for depriving Mr. Scheidler of his liberty under the 14th Amendment to the United States Constitution to enter upon the public portions of Navy Pier and Gateway Park.

**ANSWER: DENIED.**

NINTH CLAIM FOR RELIEF –
AGAINST NPI FOR 14th AMENDMENT DEPRIVATION OF LIBERTY

212.    By reason of the Trespass Notice, NPI is liable under 42. U.S.C. § 1983 for depriving Mr. Scheidler of his liberty under the 14th Amendment to the United States Constitution to enter upon the public portions of Navy Pier and Gateway Park.

**ANSWER: DENIED.**

TENTH CLAIM FOR RELIEF –
AGAINST MPEA FOR 14th AMENDMENT DEPRIVATION OF LIBERTY

213.    By reason of the Trespass Notice, MPEA is liable under 42 U.S.C. § 1983 for depriving Mr. Scheidler of his liberty under the 14th Amendment to the United States Constitution to enter upon the public portions of Navy Pier and Gateway Park.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

ELEVENTH CLAIM FOR RELIEF –
AGAINST GRAEBER FOR 14th AMENDMENT DEPRIVATION OF MICRO SD MEMORY CARD

214.    By the confiscation of the micro SD memory card, Graeber is liable under 42 U.S.C. § 1983 for depriving Mr. Scheidler of his property without due process under the 14th[h] Amendment to the United States Constitution.

**ANSWER: DENIED.**

TWELFTH CLAIM FOR RELIEF –
AGAINST NPI FOR 14th AMENDMENT DEPRIVATION of MICRO SD MEMORY CARD

215.     By the confiscation of the micro SD memory card, NPI is liable 42 U.S.C. § 1983

for depriving Mr. Scheidler of his property without due process under the 14th Amendment to the

United States Constitution

**ANSWER: DENIED.**

### THIRTEENTH CLAIM FOR RELIEF –
### AGAINST MPEA FOR 14th AMENDMENT DEPRIVATION OF MICRO SD MEMORY CARD

216.     By the confiscation of the micro SD memory card, MPEA is liable 42 U.S.C. §

1983 for depriving Mr. Scheidler of his property without due process under the 14th Amendment

to the United States Constitution.

**ANSWER: THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER ADMIT NOR DENY SUCH ALLEGATIONS.**

### FOURTEENTH CLAIM FOR RELIEF –
### AGAINST GRAEBER FOR FIRST AMENDMENT DEPRIVATION

217.     By taking actions against Mr. Scheidler in retaliation for his previous protest

activities, Graeber is liable under 42 U.S.C. § 1983 for depriving Mr. Scheidler of his rights under

the First Amendment to the United State Constitution.

**ANSWER: DENIED.**

### FIFTEENTH CLAIM FOR RELIEF –
### AGAINST NPI FOR FIRST AMENDMENT DEPRIVATION

218.     By taking actions against Mr. Scheidler in retaliation for his previous protest

activities, NPI is liable under 42 U.S.C. § 1983 for depriving Mr. Scheidler of his rights under

the First Amendment to the United State Constitution.

**ANSWER: DENIED.**

SIXTEENTH CLAIM FOR RELIEF –
AGAINST MPEA FOR FIRST AMENDMENT DEPRIVITION

219.     By taking actions against Mr. Scheidler in retaliation for his previous protest

activities, MPEA is liable under 42 U.S.C. § 1983 for depriving Mr. Scheidler of his rights under

the First Amendment to the United State Constitution.

**<u>ANSWER:</u> THE ALLEGATIONS CONTAINED IN THE PRECEDING PARAGRAPH ARE**

**NOT DIRECTED TO THE ANSWERING DEFENDANTS, DEFENDANTS NEITHER**

**ADMIT NOR DENY SUCH ALLEGATIONS.**

SEVENTEENTH CLAIM FOR RELIEF –
AGAINST GRAEBER FOR FALSE ARREST

220.     Graeber made statements upon which Montgomery solely relied in arresting Mr.

Scheidler for trespass.

**<u>ANSWER:</u> DENIED.**

221.     Graeber is liable under Illinois law for Mr. Scheidler's false arrest by

Montgomery and NPI personnel who assisted Montgomery.

**<u>ANSWER:</u> DENIED.**

EIGHTEENTH CLAIM FOR RELIEF –
AGAINST NPI FOR FALSE ARREST

222.     NPI approved of and authorized Graeber's actions and the actions of other NPI

personnel in causing Mr. Scheidler's arrest for trespass.

**<u>ANSWER:</u> DENIED**

223.     NPI is liable under Illinois law for Mr. Scheidler's false arrest by Montgomery and

NPI personnel who assisted him.

**<u>ANSWER:</u> DENIED.**

NINETEENTH CLAIM FOR RELIEF –

224.     Graeber's statements and conduct set forth above caused Mr. Scheidler's false imprisonment at Navy Pier.

**ANSWER: DENIED.**

225.     Graeber is liable under Illinois law for Mr. Scheidler's false imprisonment.

**ANSWER: DENIED.**

TWENTIETH CLAIM FOR RELIEF –
AGAINST NPI FOR FALSE IMPRISONMENT

226.     NPI approved of and authorized Graeber's actions in causing Mr. Scheidler's false imprisonment described above.

**ANSWER: DFENDANTS ADMIT THAT GRAEBER IS AUTHORIZED TO TAKE ACTION WITHIN THE SCOPE OF HIS EMPLOYMENT. REMAINING ALLEGATIONS ARE DENIED.**

227.     NPI is liable under Illinois law for Mr. Sheidler's false imprisonment.

**ANSWER: DENIED.**

TWENTY-FIRST CLAIM FOR RELIEF –
AGAINST GRAEBER FOR CONVERSION

228.     Graeber intentionally caused Mr. Scheidler's micro SD memory card to be confiscated and not returned.

**ANSWER: DENIED.**

229.     Graeber is liable under Illinois law for conversion of Mr. Scheidler's micro SD memory card.

**ANSWER: DENIED.**

TWENTY-SECOND CLAIM FOR RELIEF –
AGAINST NPI FOR CONVERSION

230.     NPI approved of and authorized Graeber's actions in causing the conversion of Mr. Scheidler's micro SD memory card.

**ANSWER: DENIED.**

231.     NPI is liable under Illinois law for the conversion of Mr. Scheidler's micro SD memory card.

**ANSWER: DENIED.**

TWENTY-THIRD CLAIM FOR RELIEF –
AGAINST NPI, GRAEBER, AND MONTGOMERY FOR NEGLIGENT SPOILIATION OF EVIDENCE

232.     NPI, Graeber, and Montgomery owed a duty of care to Mr. Scheidler to preserve his GoPro camera's micro SD card and video footage, together with NPI's surveillance video, said duty arising from the special circumstances and/or other law related to his arrest, detention, prosecution, and his right to bring this civil action and to use the video footage as evidence against said defendants.

**ANSWER: DENIED.**

233.     Defendants NPI, Graeber, and Montgomery voluntarily assumed the legal duty to preserve Mr. Scheidler's GoPro camera's micro SD card and video footage by intentionally confiscating it upon Mr. Scheidler's arrest at Navy Pier, and by voluntarily engaging in video surveillance of Navy Pier for use for and against the public.

**ANSWER: DENIED.**

234.     By failing to preserve the NPI surveillance video, Mr. Scheidler's video footage, and Mr. Scheidler's micro SD card, NPI, Graeber, and Montgomery breached their duty to do so.

**ANSWER: DENIED.**

235.    A reasonable person in the position of NPI, Graeber, and Montgomery would have known that the NPI surveillance video and the micro SD card and its video footage were material to foreseeable civil and criminal actions involving Mr. Scheidler's arrest, detention, and prosecution.

**ANSWER: DENIED.**

236.    The breach of said Defendants' duty of care is a negligent and/or intentional spoliation of evidence that is the proximate cause of damages to Mr. Scheidler.

**ANSWER: DENIED.**

237.    NPI, Graeber, and Montgomery are liable to Mr. Scheidler for negligent and/or intentional spoliation of evidence.

**ANSWER: DENIED.**

TWENTY- FOURTH CLAIM FOR RELIEF –
CONSPIRACY UNDER § 1983 AND COMMON LAW
AGAINST NPI, GRAEBER, AND MONTGOMERY

238.    Mr. Scheidler was deprived of rights secured by the United States Constitution as more fully described hereinabove.

**ANSWER: DENIED.**

239.    NPI conspired as a state actor with Graeber and Montgomery by reaching an understanding to act in concert with each other to deprive Mr. Scheidler of his said constitutional rights.

**ANSWER: DENIED.**

240.    NPI, Graeber, and Montgomery were willful participants in the conspiracy to deprive Mr. Scheidler of his constitutional rights.

**ANSWER: DENIED.**

241. NPI, Graeber, and Montgomery are liable to Mr. Scheidler for conspiracy under 42 U.S.C. § 1983 and Illinois common law.

**ANSWER: DENIED.**

TWENTY-FIFTH CLAIM FOR RELIEF –
EXEMPLARY DAMAGES AGAINST MONTGOMERY, GRAEBER, AND NPI

242. Montgomery, Graeber and NPI's acts were done without probable cause, in discrimination of Mr. Scheidler's viewpoint on political matters, and in malicious retaliation for the exercise of Mr. Scheidler's First Amendment rights at a location other than Navy Pier.

**ANSWER: DENIED.**

243. Mr. Scheidler is entitled to exemplary damages against Montgomery, Graeber and NPI.

**ANSWER: DENIED.**

TWENTY-SIXTH CLAIM FOR RELIEF –
DECLARATORY JUDGMENT AGAINST GRAEBER, NPI, AND MPEA

244. NPI and Graeber's "Trespass Notice" is unconstitutional for reasons set forth above.

**ANSWER: DENIED.**

245. Mr. Scheidler is entitled to declaratory judgment against, Graeber, NPI and MPEA that the "Trespass Notice" is unenforceable, null and void.

**ANSWER: DENIED.**

TWENTY-SEVENTH CLAIM FOR RELIEF –
INJUNCTION AGAINT GRAEBER, NPI, AND MPEA

246. The continuing prohibition against Mr. Scheidler's entry onto the public portions of Navy Pier harms him by depriving him of his liberty to utilize Navy Pier for private and business purposes, and by the embarrassment, stress, inconvenience, and stigma caused by the "Trespass Notice."

**ANSWER: DENIED.**

247.     Unless the Court issues an injunction to vacate the "Trespass Notice," Mr. Scheidler's harm will be permanent and irreparable.

**ANSWER: DENIED.**

248.     Mr. Scheidler is likely to succeed on the merits of his claims set forth herein.

**ANSWER: DENIED.**

249.     An injunction against enforcement of the "Trespass Notice" is not against the public interest.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS IN THE PRECEDING PARAGRAPH CONTAIN LEGAL CONCLUSIONS, DEFENDANTS OBJECT TO THE SAME.  REMAINING ALLEGATIONS ARE DENIED.**

250.     Mr. Scheidler has no adequate remedy at law because his access to Navy Pier and Gateway Park is a right that is uniquely related to his residence and work in the Chicago area.

**ANSWER: TO THE EXTENT THAT THE ALLEGATIONS IN THE PRECEDING PARAGRAPH CONTAIN LEGAL CONCLUSIONS, DEFENDANTS OBJECT TO THE SAME.  REMAINING ALLEGATIONS ARE DENIED.**

TWENTY-EIGHTH CLAIM FOR RELIEF –
ATTORNEYS FEES AND COSTS

251.     Under 42 U.S.C. § 1988, Plaintiff is entitled to recover reasonable attorney's fees and costs.

**ANSWER: DENIED.**

DEMAND FOR JURY TRIAL

252.     Plaintiff demands a jury on all issues so triable.

PRAYER

WHEREFORE, Defendants, **NAVY PIER, INC., an Illinois corporation; and JOHN GRAEBER**, denies that the Plaintiff is entitled to judgment in the amount prayed for, or any sum whatsoever, and prays that the judgment against this Defendant be denied, and prays this Honorable Court for an Order striking Plaintiff's Complaint, with prejudice

Respectfully submitted,

**SANCHEZ DANIELS & HOFFMAN LLP**

/s/ShawnTe Raines

Attorneys for Defendants, **NAVY PIER, INC., and JOHN GRAEBER**

ShawnTe M. Raines (6300624)
Michelle A. Franz (6279409)
**SANCHEZ DANIELS & HOFFMAN LLP**
333 West Wacker Drive, #500
Chicago, Illinois 60606
Telephone: (312) 641-1555
Fax: (312) 641-3004
E-mail: sraines@sanchezdh.com